## Affidavit of Anthony Roberto

I, Anthony Roberto, being duly sworn, do depose and say:

1. I am a Special Agent with the Drug Enforcement Administration ("DEA"), and I have been so employed since 1980. I currently am assigned to the New England Field Division of the DEA. During the course of my law enforcement career, I have participated in investigations relating to the distribution and sale of controlled substances such as cocaine, cocaine base ("crack"), oxycodone, heroin, and marijuana. I have also participated in various aspects of investigatory work, including conducting surveillance, debriefing informants, and acting in an undercover capacity. I have participated in over 100 narcotics-related arrests and the execution of dozens of narcotics-related search warrants. I also have received training at the DEA Academy concerning narcotics trafficking and money laundering and have participated in investigations involving the laundering of narcotics proceeds. I have provided instruction to state and other federal law enforcement officers regarding enforcement of narcotics laws. I have been qualified to testify as an expert in United States District Courts regarding narcotics.

2. This investigation is being conducted by DEA in cooperation with the U.S. Food and Drug Administration ("FDA") and the Peabody, Massachusetts Police Department. I am basing the information contained in this Affidavit on my personal

participation in the investigation as well as on reports and information provided to me by other federal agents, local law enforcement officers, a confidential informant, and public and private databases. I am submitting this Affidavit to establish probable cause that **Richard Gould ("Gould")** possessed with the intent to distribute oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1). Accordingly, I have not included each and every fact known to me as a result of my participation in this investigation.

3. This investigation began in September 2003 when the DEA and the FDA received information from the Peabody Police Department concerning the widespread distribution of OxyContin in the North h Shore area of Massachusetts. I know that OxyContin is a brand name for oxycodone pills manufactured in the United States and distributed domestically and internationally. Oxycodone is a Schedule II controlled substance that is used as a pain medication and that requires a prescription from a physician. I am aware that oxycodone pills are diverted illegally, that they are sold on the street as a heroin substitute, and that users have learned how to defeat the time-release mechanism in the pills. The distribution of oxycodone is a significant public health problem in Massachusetts as oxycodone users have often overdosed or have gone on to use heroin, which costs less on the street. As set forth more fully below, **Gould** has been identified

as a distributor of oxycodone on the North Shore.

**Information From Cooperating Witness**

4.  On Tuesday evening, June 29, 2004, special agents assigned to the Drug Enforcement Administration and Food and Drug Administration arrested an individual on conspiracy to distribute and distribution of oxycodone charges pursuant to a warrant issued by the United States District Court. This individual (a cooperating witness hereinafter referred to as "CI") was advised of his rights, agreed to speak with the special agents, identified his source of OxyContin, and agreed to assist in the apprehension of his source. The CI stated that **Gould** was his sole source of supply for Oxycontin for the past seven months. The CI further said he would call **Gould** and arrange for a delivery of a quantity of OxyContin to be delivered to the CI's residence. The CI went on to say that **Gould** provided the CI with a prepaid cellular telephone for the specific purpose to call him to arrange for the delivery of OxyContin.

5.  After his arrest, the CI expressed a willingness to assist in the apprehension of **Gould.** During the evening of June 29, 2004, and the morning of June 30, 2004, the CI had several consensually-recorded telephone conversations with **Gould.** During the first telephone call, the CI dialed telephone number 781-475-8325 and spoke to **Gould. Gould** told the CI he was going to pick up three (meaning 300 80 milligram OxyContin tablets)for the CI,

but would have to do so later because **Gould** was ready for bed. The CI told **Gould** that the CI needed exactly three (three hundred OxyContin tablets). **Gould** told the CI that he would have the OxyContin tablets ready early in the morning. **Gould** further asked the CI how many OxyContin tablets he would need in total because **Gould's** supply would be gone tomorrow. The CI responded that he wasn't sure and would call **Gould** the following morning. The second consensually-recorded call made by the CI to **Gould** was later the same evening and over a "Push to Talk" telephone/walkie-talkie device. During this call, the CI asked **Gould** if he was going to be awake for a while. **Gould** said he would be awake for a while. The CI asked **Gould** if **Gould** could bring them (the OxyContin tablets) immediately so the CI could have the OxyContin for the morning. **Gould** responded by chastising the CI for talking about the delivery of the OxyContin on the "Push to Talk" feature. The "Push to Talk" was then terminated.

6. The third consensually-recorded telephone call was initiated by the CI that same night. During this conversation, the CI asked **Gould** if he would mind if they met that night. **Gould** said not tonight and the best **Gould** could do was to meet the following morning. The fourth telephone call to **Gould** was initiated by the CI on the early morning of June 30, 2004. It was still dark

outside when the call was made. During this conversation, the CI asked if he could go to **Gould's** residence to pick up the OxyContin. **Gould** stated that they were not there, but at his other place and that it was not happening that night. **Gould** said that it was too late for him and **Gould** further told the CI if the CI's customer does not want to wait he can go somewhere else. **Gould** ended the conversation by telling the CI he would get it in touch with the CI in the morning. On June 30, 2004 in the morning, the CI called **Gould** at 781-475-8325 and left a voice-mail message to call the CI back as soon as possible so the CI could take care of his customer. Approximately 15-20 minutes later **Gould** called the CI and the CI asked **Gould** what time he was coming to the CI's residence and **Gould** asked how many OxyContin tablets the CI needed. The CI and **Gould** then discussed that the CI's customer needed 200 tablets and the CI needed 300 for himself. **Gould** said he would bring 5 (500 OxyContin tablets) and that's all he would have for the week. The CI asked **Gould** how long it would take for **Gould** to deliver the OxyContin. **Gould** stated that he was in Boston and would be leaving in about 5 minutes.

7.   On June 30, 2004 at approximately 11:15am, **Gould** was observed by surveillance agents operating a Black Mercedes SUV bearing Massachusetts registration 59AL15 and parking his vehicle in front of 5/10 Trask Court, Beverly, MA. **Gould** exited his

vehicle and began to walk around the building marked 10 Trask Court. Agents approached **Gould**, identified themselves, and then **Gould** started to run away from the agents and behind the building marked 5/10 Trask Court. **Gould** was then apprehended on the side of 5 Trask Court and placed under arrest. A search of **Gould's** person did not provide any OxyContin. A search of the area where Gould was seen running was searched by agents and ultimately a plastic bag containing green pills marked OC/80 was recovered in the woods behind 10 Trask Court and 5 Trask Court. A count of the pills revealed 502 pills.

8. Based on the foregoing, I believe that there is probable cause to believe that on or about June 29, 2004, **Robert Gould** knowingly and intentionally conspired to possess and distribute oxycodone, in violation of 21 U.S.C. § 846, and knowingly and intentionally possessed with the intent to distribute oxycodone in violation of 21 U.S.C. § 841(a)(1).

ANTHONY ROBERTO
Special Agent
Drug Enforcement
Administration

Sworn to and subscribed to me this 29th day of June 2004.

CHARLES B. SWARTWOOD III
United States Magistrate
Judge

6